**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 16-7607**

UNITED STATES OF AMERICA,

                 Petitioner - Appellant,

      v.

WALTER WOODEN,

                 Respondent - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Terrence W. Boyle, District Judge.  (5:10-hc-02151-BO)

Argued:  September 15, 2017                    Decided:  April 10, 2018

Before MOTZ, TRAXLER, and KEENAN, Circuit Judges.

Affirmed by published opinion.  Judge Traxler wrote the opinion, in which Judge Motz and Judge Keenan joined.

**ARGUED:** Benjamin M. Shultz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant.  Debra Carroll Graves, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; John Stuart Bruce, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellant.  Thomas P. McNamara, Federal Public Defender, Eric J. Brignac, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellee.

TRAXLER, Circuit Judge:

The Adam Walsh Child Protection and Safety Act of 2006 (the "Act"), Pub. L. No. 109–248, 120 Stat. 587 (codified as amended in scattered sections of 18 and 42 U.S.C.), authorizes the government to civilly commit "sexually dangerous" federal inmates after the expiration of their sentences. 18 U.S.C. § 4248(a). A defendant is a "sexually dangerous person" if he has a prior act or attempted act of child molestation or sexually violent conduct and is "sexually dangerous to others." *Id.* § 4247(a)(5). A defendant is sexually dangerous to others if he "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id.* § 4247(a)(6).

In 2010, Walter Wooden was serving a sentence at a federal correctional facility when the government began proceedings against him under the Act; he was civilly committed as a sexually violent predator in 2014. In 2016, Wooden requested a hearing to address whether he should be released. *See* 18 U.S.C. § 4247(h). After a hearing, the district court concluded that Wooden no longer qualified as a sexually dangerous person and ordered Wooden's release. The government appeals. As we will explain, the highly deferential standard of review applicable to this case compels us to affirm.

I.

A.

Wooden, who was born in 1956, has a limited intellectual capacity. *See United States v. Wooden*, 693 F.3d 440, 443 (4th Cir. 2012) ("*Wooden I*"). In 1972, when

3

Wooden was 16, he was twice adjudicated delinquent for committing rectal sodomy on a minor. The next year, he was again was adjudicated delinquent after sexually molesting a minor. In 1974, Wooden was charged as an adult and pleaded guilty to taking indecent liberties with a four-year-old child. Wooden received a 10-year sentence but was paroled into the community in 1980. In 1984, Wooden was convicted and sentenced to 25 years' imprisonment after separate incidents involving an eight-year-old boy and a twelve-year-old boy. Wooden was paroled in 2000, returned to prison in 2001 after violating the terms of parole, and paroled again in 2002.

After being paroled in 2002, Wooden began sex-offender treatment with Dr. Ronald Weiner. By 2005, Weiner believed Wooden was responding well enough to treatment that he was thinking about discharging him. Before that happened, Wooden resisted taking a routine polygraph, and he ultimately told Dr. Weiner that he had had sexual contact in the basement laundry room of his building with a seven-year-old boy he had been alone with on previous occasions. Wooden later changed his story and claimed that he only dreamed about touching the boy. When interviewed by the police, the boy denied that Wooden had touched him, but he did say that "he was afraid to be around Wooden, even though Wooden sometimes gave him money." *Wooden I*, 693 F.3d at 444-45.

During a June 2005 polygraph, Wooden gave "non-deceptive" answers that admitted to having "deviant sexual thoughts" about children in the past year, being sexually aroused in the presence of children in the past year, engaging in sexual activity with a child in the past year, and attempting to engage in sexual activity with a different

4

child. *See id.* at 444. The District of Columbia parole board determined that Wooden's story about the boy in the laundry room was true and revoked Wooden's parole. Wooden served the revocation sentence at the Federal Correctional Institute in Butner, North Carolina.

B.

In 2010, shortly before Wooden was scheduled to be released from Butner, the government filed a petition seeking to civilly commit him under the Act. At the hearing on the government's petition, Drs. Hy Malinek and Heather Ross testified as expert witnesses for the government. Both experts agreed that Wooden suffered from pedophilia, which qualifies as a "serious mental illness" under the Act; that his illness would make it difficult for Wooden to refrain from reoffending if released; and that commitment under the Act was therefore warranted. Wooden presented the expert testimony of Dr. Terence Campbell. Campbell testified that Wooden no longer qualified as a pedophile and that he did not have a volitional impairment, such that commitment was not appropriate.

The district court denied the commitment petition, largely adopting Campbell's analysis. The court agreed that Wooden had suffered from pedophilia in the past, but concluded that the government had not proven that Wooden still suffered from pedophilia at the time of the hearing. As to the Act's volitional-impairment requirement, the district court held that it was not sufficient for the government to prove that the mental illness caused the defendant to have "serious difficulty in refraining from sexually violent conduct or child molestation if released," as required by the Act. 18 U.S.C. § 4247(a)(6).

5

Instead, the court concluded that the Constitution required the government to also prove that the defendant was dangerous, which the court believed required evidence showing a five-year recidivism rate of at least 50%. Because the government's evidence fell short of that threshold, the district court dismissed the government's petition. *See Wooden I*, 693 F.3d at 450.

The government appealed to this court. Although we recognized that review of the district court's factual conclusions was governed by the highly deferential clearly-erroneous standard, we found the district court's analysis wanting in several respects. Most significantly, we explained that the district court (1) failed to account for evidence showing Wooden's then-current sexual interest in children when concluding that Wooden was not a pedophile, *see id.* at 452; (2) failed to address certain internal inconsistencies and deficiencies in Dr. Campbell's report and testimony, *see id.* at 454-55; (3) erred by equating volitional impairment with impulsiveness and then ignoring strong evidence of impulsiveness, *see id.* at 457-58; (4) failed to consider other evidence relevant to the question of volitional impairment, *see id.* at 459; and (5) erred by requiring proof of a greater-than-50% risk that Wooden would re-offend within five years, *see id.* at 461. We therefore reversed the district court's decision and remanded for further proceedings.

On remand, the district court concluded that our opinion in *Wooden I* required it to find that Wooden was a sexually violent predator, and the court therefore ordered Wooden committed. We reversed and remanded again, explaining that "our mandate contemplated the possibility that a proper distillation of all the evidence, including a full accounting of all contradictory and conflicting evidence, could perhaps support the

6

district court's original findings." *United States v. Wooden*, 546 F. Appx. 229, 231 (4th Cir. 2013) (per curiam) (unpublished). After the second remand, the district court again certified Wooden as sexually dangerous. Limiting the record to the evidence developed for the original 2011 hearing, the court concluded that Wooden suffered from pedophilia at the time of the hearing and that he would have serious difficulty refraining from reoffending if released.

## C.

In 2014, counsel for Wooden hired Dr. Joseph Plaud to evaluate Wooden's then-current condition. After his first interview with Wooden, Plaud became concerned about Wooden's neurocognitive development, and he strongly recommended that Wooden undergo medical and neuropsychological evaluations. Counsel then brought in Dr. Frederick Winsmann to evaluate Wooden. Dr. Winsmann, a psychologist, is a leading expert on the issue of volitional control in sex offenders. He is the founder of the Boston Symposium on Psychology and the Law, "an annual event . . . [that] bring[s] together experts in the field of psychology and psychiatry, as well as the law . . . . to discuss difficult topics and advance the field." J.A. 462.

Winsmann interviewed Wooden multiple times and conducted a battery of tests measuring Wooden's memory, intellectual ability, and adaptive functioning. Winsmann also interviewed some of Wooden's family members. Winsmann concluded that Wooden suffers from Intellectual Development Disorder ("IDD"), a condition previously referred to by mental-health professionals as mental retardation. Although evidence of Wooden's intellectual limitations was part of the original hearing record, *see Wooden*, 693 F.3d at

7

443, his intellectual capacity was not then a focus of the experts' reports. In Winsmann's view, the earlier failure to diagnose IDD or recognize its significance led to an incorrect diagnosis of pedophilia.

(1)

On March 22, 2016, Wooden filed a motion requesting a hearing to determine whether he should be discharged. *See* 18 U.S.C. § 4247(h).

At the hearing, Dr. Winsmann testified that Wooden met the diagnostic criteria for IDD. According to Winsmann, Wooden has a full-scale IQ of 75 but presents and communicates at an even lower level. Winsmann testified that Wooden's "adaptive functioning is very much impaired"; that his communication skills are "very low"; and that his cognitive functioning compares to that of a 3rd- to 5th-grader. J.A. 470, 471.

When viewing Wooden's past actions and statements through the IDD lens, Winsmann testified that he saw no evidence of pedophilia. According to Winsmann, Wooden's "past offenses in the '70s and '80s were more opportunistic and borne out of his intellectual deficit rather than this deviant preferential urge or arousal to children." J.A. 483. Winsmann explained,

> I don't see the focused interest on children. I see a global interest in many different ages in his sexual interest. And I also see these real adaptive difficulties that drive someone like this to really feel more comfortable around persons who are so much younger than him chronologically, but he is . . . really close to their age in terms of emotional and cognitive development.
>
> So when you look at these factors and the way he's functioned in the world, it's more compelling to me, it's more compelling. I considered Pedophilic Disorder. I would not be doing my job if I didn't. But [IDD is the] more compelling explanation for his behavior.

8

J.A. 482.

In Dr. Winsmann's view, the scope of Wooden's intellectual and communicative deficits had long been overlooked, which ultimately led to an incorrect diagnosis. For example, Wooden's earlier statements that his very young victims came to him asking for sex were treated as "cognitive distortions or 'thinking errors' common to sex offenders," *Wooden I*, 693 F.3d at 452–53, when Winsmann believed they should have instead been understood as "the musings of someone, all due respect to Mr. Wooden, mentally retarded." J.A. 507.

Winsmann also testified that, at the time of the hearing, Wooden did not have a serious difficulty controlling his behavior. Winsmann explained that people with IDD do develop, but they do so very slowly. And in his view, Wooden's time in prison had given him the ability to "weigh consequences, make choices, and think things through," and that Wooden therefore would not have "serious difficulty in controlling [his] behavior." J.A. 484. As proof of Wooden's growth, Winsmann pointed to the "clear downward trend" in the frequency of Wooden's disciplinary infractions. J.A. 487. According to Winsmann, the decreasing frequency showed that Wooden was increasingly able to restrain himself and control his anger and impulsivity.

Dr. Plaud testified that while he diagnosed Wooden with pedophilic disorder based on historical data, "there's really no evidence . . . in the last ten years that Mr. Wooden, as he sits at Butner, has recurrent or intense sexually arousing fantasies, urges, or behavior involving sexual activity with prepubescent males. There's nothing." J.A. 552-53. Plaud testified that he agreed with Winsmann that Wooden had IDD. *See* J.A. 553

9

("I would fully and completely agree that Mr. Wooden has what we used to call mental retardation, now IDD."). Plaud also agreed with Winsmann that Wooden now had sufficient volitional control:

> [W]e have more understanding now historically about why he may have done what he did when he was younger. Because if you look at . . . when he was active, engaged in pedophilic behavior, he, himself, was a teenager and in his 20s. I think he was delayed.
>
> You know, the question earlier was well, would a four year-old do something to another four year-old? Well, no, because both of them don't really have much hormones going on there. But if you're 14 or 15 and you have physically the hormone development, the development of secondary sexual characteristics but your mind is 10 years behind, that's a problem. And so you might see some sexualized behavior given the physiology going on. But the brain is delayed. It can't process it like he was a 14 year-old.
>
> That's what you got in my judgment. That's . . . one of the significances of this disorder that has gone up until this hearing now basically unrecognized for Mr. Wooden.
>
> So you fast forward. He's not 14 or 24 or 34, he's 60 years old. Now, it takes a long time to catch up. Now, is he functioning typically, cognitively like a 60 year-old? No. But he's not functioning like a four year-old either. I think he has that fundamental understanding now of the wrongfulness of engaging in that behavior as a 60 year-old.

J.A. 559-60.

The government's experts, Dr. Malinek and Dr. Ross, both testified that Wooden continued to qualify for commitment under the Act. As to the IDD diagnosis, Malinek acknowledged that Wooden had adaptive and intellectual deficits, but he questioned whether IDD "is really fully present here." J.A. 605. In any event, Malinek rejected Winsmann's argument that "IDD is now the explanation for it all." J.A. 606. Malinek explained that

10

> IDD has played a role in his history. I'm not saying it did not have an impact. I view it as a facilitator or as a disinhibitor, as a factor involving poor judgment.
>
> Individuals with IDD, if you look at the examples in the book or in the literature, are not prone to pedophilic conduct. There's nothing in IDD in the DSM or the research that talks about proneness to aggressive, persistent interest in prepubescent [children].
>
> You do have people with IDD who have obviously sexual urges as they grow and they do not know how to seek partners, they have poor judgment. They may have boundary-violating behavior. But [Wooden's conduct] is not simply boundary-violating behavior. What he engages in is aggressive, persistent, predatory sexual conduct with prepubescent children.

J.A. 625-26; *see also* J.A. 607 ("[T]here's an impact of his cognitive difficulty here. This is a contributor. I see it as a risk factor. But there's nothing in . . . mild mental retardation or intellectual disability that has a link to sexual conduct of that kind that we have seen here."). Malinek also questioned whether Wooden was a "reliable informant" and whether his denial of sexual interest in children should be believed. J.A. 611. In Malinek's view, IDD simply could not explain away the conduct that Wooden had engaged in:

> [T]he conduct and the planning and the isolating of the children . . . shows that is totally not IDD. That is forward, aggressive conduct directly that's coming from sexual arousal. He's not befriending them for friendship . . . as you would anticipate if he had just IDD, playing with them. There's no show me yours and I'll show you mine -- if he was, indeed, at this level. There is movement to anal sex right away. And that is a paraphilic, persistent paraphilic chain here over time.

J.A. 627. In response to a question from the government, Malinek described Wooden as

> among the most dangerous sex offenders that I have evaluated. There is an unbroken chain of recidivism here. There's the undisputed evidence of pedophilia. There's acting out while in treatment. There is predatory behavior, seeking stranger children for the purpose of sodomy. There's

11

adult and child offenses. There's no amenability, no interest in treatment. There's definitely evidence of defective controls and easily aroused anger. So I believe he remains highly dangerous.

J.A. 633. The district court strongly disagreed with that assessment, interjecting that Malinek's description of Wooden "just thoroughly impeached all of [Malinek's] testimony." J.A. 633. The court's statement echoed an earlier critique of Malinek's testimony. Responding to Malinek's testimony that narcissism was a "prominent" aspect of Wooden's personality, J.A. 598, the district court stated:

> [Y]ou've been telling me he's a narcissist and entitled and filled with claims and demands for entitlement. I see a person who is mentally retarded and feebleminded and not really presenting with any of those sorts of conditions.
>
> You know, your perception of the case is just so out of line with what I see, that I'm -- honestly, I don't have anything to hide. I'm honest in telling you that.

J.A. 603.

Wooden testified in support of his discharge petition and expressed regret for his actions. He testified that he "took advantage of them little kids," J.A. 425, and he acknowledged that it was not the right thing to do. He testified that he is attracted to women and is no longer attracted to young boys. When pressed by the government, Wooden stated that the last time he was attracted to boys was sometime between 2002 and 2004. *See* J.A. 446. While Wooden had maintained in the 2011 commitment proceedings that his victims came to him for sex, he explained in this hearing that the children came to him asking for money, not sex. Under persistent questioning by the government, Wooden refused to blame his victims and consistently placed blame on

12

himself. *See* J.A. 441 ("No, it's my fault for, my fault for taking advantage of them. It ain't their fault. It's my fault for taking advantage of them.").

(2)

The district court ruled in favor of Wooden. Assigning the burden of proof to Wooden, the district court concluded that Wooden no longer satisfied the statutory requirements for commitment.

As to whether Wooden was then "suffer[ing] from a serious mental illness, abnormality, or disorder," 18 U.S.C. § 4247(a)(6), the district court specifically credited the testimony of Dr. Winsmann and concluded that pedophilic disorder was not a proper diagnosis for Wooden. The court explained:

> [T]he Court highly credits the testimony and conclusions of Dr. Winsmann and Dr. Plaud that Mr. Wooden has suffered from Intellectual Development Disorder throughout the duration of his life and that IDD is a better explanation for Mr. Wooden's past criminal behavior than Pedophilic Disorder.
>
> The Court heeds the testimony of Dr. Malinek that individuals with IDD usually do not commit sexual crimes but are instead often the victims of sexual assault. The Court also considered Dr. Malinek's testimony that persons can, and often do, suffer from multiple disorders and that, in his opinion, IDD cannot be the sole explanation for all of Mr. Wooden's past behavior because there is nothing in IDD that compels deviant sexual attraction to children.
>
> While it is undisputed that Mr. Wooden has molested children and exhibited strong sexual interests toward prepubescent, male children, there is also evidence demonstrating that Mr. Wooden has exhibited sexual attraction toward adult women and has had adult, age-appropriate partners. The Court finds compelling both Dr. Winsmann and Dr. Plaud's explanation for Mr. Wooden's past behavior as being a result of serious intellectual delay such that Mr. Wooden experienced the physical and hormonal development of a teenager and young adult but the cognitive development and maturity of a much younger person, as much as 10 or 15

13

years behind, and was therefore unable to understand or control his sexual urges. . . . Whereas Doctors Ross and Malinek ascribe Mr. Wooden's past sexual misconduct to an uncontrollable sexual attraction to prepubescent male children, Doctors Plaud and Winsmann conclude that the record evidence is indicative of a global sexual interest, which when coupled with adaptive difficulties and an impaired emotional and cognitive development, led to deviations from acceptable conduct and an inability to weigh consequences with the maturity of a developed person of his physical age. *Essentially, due to his IDD or mental handicap, Mr. Wooden lacked the cognitive functioning and emotional maturity to form healthy relationships, control or understand his sexual urges, or discriminate between partners his own age and children with whom he more easily bonded emotionally.* Mr. Wooden himself has exhibited these characteristics as the Court has observed him over the course of five years. The Court finds that this reasoning is compelling and that the record evidence supports this conclusion.

J.A. 657-58 (emphasis added). The district court also noted that the DSM-V[1] requires sexual arousal for a six-month period for a diagnosis of a paraphilia such as pedophilic disorder, but that Winsmann and Plaud both testified that Wooden was not currently exhibiting pedophilic urges. The court stated that "Wooden [has] not exhibited any pedophilic urges since 2005, [and] he also testified credibly that he no longer experiences those impulses." J.A. 659. The district court therefore concluded that "the record in this case no longer contains substantial evidence that Wooden is having intense and recurrent sexually arousing fantasies and urges about prepubescent children." *Id.* (internal quotation marks and alteration omitted). After rejecting the pedophilia diagnosis, the district court concluded that IDD does not qualify as a "serious mental illness,

---

[1] The DSM-V is the fifth edition of the *Diagnostic & Statistical Manual of Mental Disorders*, published by the American Psychiatric Association. *See United States v. Maclaren*, 866 F.3d 212, 215 (4th Cir. 2017).

14

abnormality, or disorder" under the Act[2] and that Wooden had no other condition that qualified. Accordingly, the district court concluded that Wooden did not have a "serious mental illness, abnormality, or disorder," as required to qualify him as a sexually violent predator under the Act. 18 U.S.C. § 4247(a)(6).

The court then moved on to the question of Wooden's volitional control. The court credited the testimony of Drs. Winsmann and Plaud that Wooden

> has progressed cognitively and emotionally to the point that he no longer faces a serious difficulty refraining from child molestation if released. In the opinions of Doctors Plaud and Winsmann, Mr. Wooden is no longer expressing arousal to children, has developed an ability to weigh choices and understand consequences, and has shown reduced impulsivity. These, especially when weighed alongside several protective factors including his increased age, infirmity, and a release plan, show that Mr. Wooden will be able to control his behavior and reduces the risk that he will reoffend.

J.A. 664.

The court specifically found the views of Dr. Malinek and Dr. Ross "unreliable" on the question of Wooden's "present condition" and explained that the doctors "relied too heavily upon historical criminal behavior to justify their conclusions that he is currently sexually dangerous." J.A. 664-65. The district court rejected Malinek's assertion that Wooden was one of the most dangerous sex offenders he had evaluated, stating that Malinek's "inflated conclusion flatly contradicts the picture of Mr. Wooden as the Court finds him today: 60 years old, physically and mentally handicapped, and expressing credible regret over his past actions." J.A. 665.

---

[2] The government does not challenge this ruling on appeal.

15

The district court noted Wooden's improved behavior in prison, as shown by "sharply declining rates of insubordinate behavior and disciplinary citations," *id.*, and by the fact that Wooden had never been cited for possessing child pornography or other sexual material while confined at Butner. In the view of the district court, "[t]his is evidence of an increasing amount of self-control and weighs toward a finding that Mr. Wooden will not face a serious difficulty refraining from sexual misconduct." J.A. 665. Again concluding that the 2005 laundry-room incident did not occur,[3] the court observed that Wooden's last criminal offense occurred in 1983, and that there was no evidence that Wooden had "experienced any . . . intense sexual urges toward male children" in many years. J.A. 667.

The district court recognized that the actuarial models[4] placed Wooden in the "moderate-high risk category for sexual re-offense." J.A. 668. The court gave less weight to those assessments, however, because they were "based almost entirely on historical factors which can never change and do not account for any development in [Wooden's] mental health." *Id.* Although Wooden had refused sex-offender treatment while at Butner, the district court believed that his refusal was more a function of his intellectual deficits and misunderstandings about the nature of the program than a denial

---

[3] The district court made the same factual determination when considering the government's initial commitment petition. *See Wooden I*, 693 F.3d at 449.

[4] "[A]ctuarial models consider risk factors that have been shown to be predictive of recidivism. Sex offenders are scored under the model based on the presence or absence of the risk factors in that offender's crimes, and the offender's risk of recidivism is determined by reference to the known recidivism rates of released sex-offenders who received the same score under the model." *Wooden I*, 693 F.3d at 447 n.2.

16

of his past crimes or a rejection of the general value of treatment. In the district court's view, the totality of the evidence showed that "Wooden has gained an awareness of the wrongfulness of his actions, that he has regret for his actions, and that he understands the consequences of his past behavior." J.A. 669.

The district court also noted that Wooden's age and health issues made it less likely that Wooden would reoffend if discharged. Wooden was 60 at the time of the hearing; as the district court noted, male sex drive decreases with age, which also reduces the risk of sexual re-offense. Moreover, Wooden was in poor health and generally used a wheelchair, which further reduced the likelihood that Wooden could engage in a forcible offense. Wooden planned to live with his sister on release, and she testified about the steps she would take to ensure that Wooden would not reoffend. In the district court's view, Wooden's planned living arrangements "will provide a safeguard that reduces the risk of recidivism." J.A. 671. The district court therefore concluded that Wooden had carried his burden of proving that he no longer qualified as a sexually dangerous person under the Act, and the court ordered the government to release Wooden.[5]

The government appeals, arguing that the district court erred in concluding that Wooden did not suffer from pedophilic disorder and in concluding that Wooden would not have serious difficulty refraining from re-offending.

Whether a defendant qualifies for commitment or discharge under the Act involves inherently factual questions to be resolved by the district court as fact-finder,

---

[5]    We granted the government's emergency motion to stay Wooden's release pending appeal.

17

and we review the district court's factual findings for clear error. *See Wooden I*, 693 F.3d at 451. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (internal quotation marks omitted). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (internal quotation marks omitted).

## II.

We first consider the government's challenge to the district court's conclusion that Wooden's past misconduct was the product of IDD, not pedophilic disorder.

## A.

Although not identified as a separate issue on appeal, the government's overarching claim seems to be that Dr. Winsmann's testimony was not worthy of credence. We disagree.

Winsmann is a licensed psychologist who teaches at Harvard Medical School. He provides treatment to patients, including 150-200 sex offenders, as well as patients with IDD, some of whom also exhibited sexually inappropriate behavior. Winsmann has also performed approximately 170 forensic evaluations in state and federal sexually-violent-predator cases; he found the defendants to meet the criteria for commitment in 45% of the cases. Winsmann is one of the leading experts focusing on questions of volitional control in sex offenders. In 2012, he published the first article in the field that attempted to

18

"outlin[e] a protocol and approach [for] assessing serious difficulty in controlling behaviors." J.A. 463. As explained in Winsmann's article, the development of a protocol is critical because "specialized tests and procedures [for assessing volitional control] do *not* presently exist and mental health examiners have been, to date, relying entirely on their imprecise and unreliable clinical judgment." J.A. 522. Winsmann founded the Boston Symposium on Psychology and the Law, an annual academic gathering of experts in the fields of psychiatry, psychology, and the law. In 2015, the Symposium focused on the subject of volitional control in the context of civil commitment of sexual offenders. Winsmann's qualifications and expertise, which are not disputed by the government, are thus well matched to the issues in this case.

Winsmann's initial review of Wooden's records immediately raised questions about Wooden's intellectual capacity, and Winsmann administered a battery of tests to measure Wooden's intelligence. Considering the results of those tests and his hours of interviews with Wooden, Winsmann ultimately concluded that Wooden suffered from IDD and that it was IDD, not pedophilic disorder, that was the driving force behind Wooden's crimes.

Winsmann explained that a diagnosis of pedophilic disorder required evidence of "current arousal" to children. J.A. 478. Winsmann found no evidence that Wooden was currently aroused by children – Wooden repeatedly denied it in interviews, and Winsmann found nothing else in the record indicating current arousal. Winsmann testified that Wooden had a "global sexual interest" rather than a "focused preference on children." J.A. 478. Winsmann based that determination on his interviews with Wooden,

19

where Wooden reported three romantic relationships with adult women, and Winsmann's interviews with two of Wooden's sisters, who confirmed that Wooden had peer-aged girlfriends during the periods when he was not incarcerated. *See* S.J.A. 53.

Given Wooden's global sexual interests and the absence of any evidence of current intense arousal to young children, Winsmann concluded that Wooden did not suffer from pedophilic disorder and that IDD provided a "better explanation" for Wooden's offenses. J.A. 481. As explained in his report, Winsmann concluded that the original diagnosis of pedophilic disorder was wrong:

> The past improper decision making was made through a past developmental lens. There is no clear and apparent evidence to support a diagnosis of Pedophilic Disorder, and, I believe, there is a better explanation for his past behavior when developmental considerations are properly given weight. In short, past diagnoses of a paraphilic nature were made in error.

S.J.A. 72.

Winsmann testified that people with IDD are capable of personal and intellectual growth, but that the growth happens very slowly. He believed that Wooden had experienced sufficient growth over the years of his incarceration that he had developed "sufficient ability to weigh decisions and weigh outcomes." J.A. 488-89. Winsmann stated in his written report that

> Mr. Wooden, intellectual deficits notwithstanding, showed evidence of being able to examine the basis of and the associations to his thoughts so that the sequelae of events, from thought to action, does not lead to an offense. This is strong evidence of cognitive mediation – that active psychic process that allows for one to modulate behavior.

S.J.A. 68.

20

Winsmann's opinion is plausible, coherent, and internally consistent, and thus does not suffer from the problems that undermined the testimony of Wooden's expert in the original commitment hearing. *See Wooden I*, 693 F.3d at 454-55 ("Dr. Campbell's testimony was internally inconsistent and was otherwise deficient or problematic in so many respects that his opinion provides no safe harbor for the district court's factual findings."). Moreover, Winsmann's belief that Wooden had slowly developed the ability to consider the consequences of his actions and modulate his behavior finds support in evidence before the district court.

Wooden was convicted multiple times of sexual crimes against children over a period from his late teens through his 20s. Wooden was sentenced to 25 years' imprisonment in 1984 and was paroled in 2002, when he was 46. While on parole, Wooden participated in sex-offender treatment supervised by Dr. Ronald Weiner. In 2005, Wooden reported the laundry-room encounter to Weiner. In the course of the ensuing investigation, Wooden stated during a polygraph examination that he had had sexual contact with a boy in the past year, and he told Weiner about two instances where he had come close to committing an offense but had changed his mind and did not go through with it. As to the questionable laundry-room incident itself, the facts as found by the district court established that Wooden was having sexual urges and dreams about a seven-year-old boy with whom he spent time alone, but Wooden did not act on those urges. Thus, comparing Wooden's conduct in the 1970s and 1980s to his conduct in the early 2000s, Wooden went from committing multiple forcible sexual offenses to committing some kind of sexual contact on one occasion while stopping himself from

21

offending on several other occasions. While Wooden's conduct in 2002-2005 was still problematic, it nonetheless represents a dramatic improvement over his conduct 30 years earlier. This trajectory is consistent with Winsmann's testimony that people with IDD grow, but do so very slowly, and that they can learn to modulate their behavior.

Evidence of Wooden's personal growth can also be seen in the change in Wooden's testimony and demeanor between the proceedings in this case. In the 2011 commitment hearing, Wooden was at times "difficult and recalcitrant," *Wooden I*, 693 F.3d at 445, and he repeatedly insisted that his young victims came to him seeking sex, *id.* at 445-46. In the 2016 discharge hearing, however, Wooden was a cooperative witness, and he no longer claimed that the victims came to him for sex. Instead, he testified that they came to him asking for money and that he knew he shouldn't have taken advantage of them. The district court, which had been involved with Wooden's case from the beginning, found Wooden's statements of regret to be credible. Wooden thus went from being uncooperative and in denial in 2011 to being genuinely remorseful in 2016. This change in Wooden's behavior likewise provides support for Winsmann's views.

Wooden's behavior in prison provides further evidence of his personal growth and maturation. During his early years of incarceration, Wooden had many angry outbursts, and he was once transferred to a different prison after threatening his guards. As Winsmann observed, however, Wooden's behavior has improved over the years at Butner. He has not had an angry outburst in at least a decade, and the number of disciplinary citations has dropped dramatically.

22

Winsmann's testimony thus presented the district court with an overarching, unifying theory of the case: Wooden suffered from IDD, and the previous failure to recognize the effect of IDD on Wooden's actions and communications caused other medical professionals to misdiagnose Wooden as suffering from pedophilic disorder. Winsmann's theory is "coherent and facially plausible," and it is not "contradicted by extrinsic evidence." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Instead, Winsmann's theory is supported by the slow improvement in Wooden's behavior, as explained above. Accordingly, there is nothing in Winsmann's views that, in and of itself, raises doubts about the district court's decision to credit his testimony. *See id.* ("[W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error."). The question, then, is whether there are other errors in the district court's analysis that would make the court's conclusion that Wooden suffered from IDD, not pedophilic disorder, clearly erroneous.

B.

The government contends that "[t]he record as a whole, and Dr. Malinek's testimony in particular," show that the court erred in accepting Winsmann's IDD diagnosis. Brief of Appellant at 15. In support of this argument, the government notes that Wooden committed several of his crimes in his late twenties and that he was still having pedophilic urges in 2005. In the government's view, these facts cannot be reconciled with the district court's conclusion that Wooden committed his criminal

23

offenses because he had a developmental delay of 10-15 years as a result of his IDD. We disagree.

As to the reference to a 10-15 year developmental delay, the central part of the district court's holding was that, as to his early offenses, Wooden was "unable to understand or control his sexual urges" because he "experienced the physical and hormonal development of a teenager and young adult but the cognitive development and maturity of a much younger person," J.A. 657, but that Wooden had now grown and progressed to the point where he would not engage in the same conduct again. As discussed above, that general conclusion, which is based on Dr. Winsmann's testimony, is supported by evidence in the record. Accordingly, even if the court's reference to a 10-15 year developmental gap did not precisely capture the nuances of the issue, the error does not undermine the district court's analysis or ultimate conclusion.

As to the government's larger point, the district court did not ignore Malinek's testimony, but the court was not required to find it persuasive. The district court fairly summarized Malinek's testimony and acknowledged Malinek's testimony that IDD could not explain Wooden's violent crimes against prepubescent children, *see* J.A. 653, 657, but the court nonetheless found Winsmann's testimony to be more persuasive. Although a variety of factors go into a court's credibility determinations, the district court put some of its reasons on the record: the court believed that portions of Malinek's testimony were directly contradicted by the court's own observations of and experiences with Wooden over the years and that Malinek focused too heavily on historical criminal behavior rather than Wooden's present condition. Moreover, Winsmann reached his diagnosis after

24

interviewing Wooden for hours and administering a battery of tests to measure his intellectual capacity, while Malinek rejected the IDD diagnosis without ever even talking to Wooden. *See* J.A. 480 (Winsmann testified that "you have to understand how a person like this communicates. And these simple words can sometimes be misunderstood or taken out of context, if . . . you don't have the experience working with him or . . . you don't spend enough time with Mr. Wooden.").

As just discussed, Winsmann's testimony, standing alone, was coherent, plausible, and internally consistent; it is not any less so when it is placed beside Malinek's testimony. Under these circumstances, the district court's decision to accept Winsmann's views over Malinek's contrary views is not clearly erroneous. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

## C.

The government also contends that the district court erred by crediting Wooden's claims that he was sexually attracted to women without addressing Dr. Malinek's assertion that such an attraction would not be inconsistent with a diagnosis of pedophilic disorder.[6] We see no error.

---

[6] To the extent that the government suggests Wooden's asserted interest in adult women is not believable, we note that Wooden's sisters confirmed to Winsmann that Wooden had had peer-aged girlfriends. In addition, prison officials found pictures of lingerie-clad adult women in Wooden's cell. Although Wooden claimed the pictures belonged to his cellmate, he admitted to Winsmann that he was sexually aroused when looking at the pictures. During a recorded phone call, Wooden also expressed interest in (Continued)

25

Malinek's testimony was not contrary to the district court's finding, as the court did not conclude that Wooden's attraction to adult women precluded a pedophilic-disorder diagnosis. Rather, the district court concluded that Wooden had a "global sexual interest," but that his impaired cognitive functioning and adaptive difficulties led him to act against children, "with whom he more easily bonded emotionally." J.A. 658. Under these circumstances, we cannot say that the district court clearly erred by failing to explicitly address this portion of Malinek's testimony.

D.

The government also maintains that the district court failed to reconcile its conclusion that Wooden suffered from IDD and was not a pedophile with the aggressive, calculating nature of Wooden's prior offenses. Dr. Malinek testified that people with IDD are gullible and more likely to be the victim of violence than a violent aggressor. In Malinek's view, Wooden's behavior was very different from what would be expected from a person with IDD:

> [T]he conduct and the planning and the isolating of the children . . . all . . . shows that is totally not IDD. That is forward, aggressive conduct directly that's coming from sexual arousal. He's not befriending them for friendship . . . as you would anticipate if he had just IDD.

J.A. 627. The government contends the district court failed to address this evidence.

We disagree. Contrary to the government's argument, the district court did consider and address this part of Malinek's testimony. The court referred to this issue

having a relationship with the female attorney representing him in these proceedings. *See* J.A. 634.

26

when summarizing Malinek's testimony, *see* J.A. 653, and again in its substantive analysis, *see* J.A. 657 ("The Court heeds the testimony of Dr. Malinek that individuals with IDD usually do not commit sexual crimes but are instead often the victims of sexual assault."). While the district court did not specifically explain why it did not find that specific portion of Malinek's testimony persuasive, it was not required to do so. Our cases require district courts to take substantial contrary evidence into account when acting as the finder of fact, *see, e.g.*, *Wooden I*, 693 F.3d at 451, but that does not mean the court must explain in detail why it rejects each and every individual piece of evidence. Here, the district court explicitly acknowledged Malinek's views, but the court was nonetheless persuaded by Winsmann's testimony that Wooden's aggressive sexual behavior was the product of IDD. Under our deferential standard of review, the district court's treatment and consideration of Malinek's testimony was sufficient.

E.

The government also argues that the district court committed reversible error when it credited Wooden's testimony that he was no longer attracted to young boys. The government notes that the record in the original commitment proceedings included evidence that Wooden was still experiencing pedophilic urges as late as 2011, *see* *Wooden I*, 693 F.3d at 452 (noting that in his 2011 deposition, Wooden acknowledged that he had been having sexual thoughts about children). According to the government, the district erred by overlooking this evidence and "accepting Wooden's testimony that he [had] not experienced pedophilic urges since he was returned to custody in 2005." Brief of Appellant at 17.

27

The government's argument misstates the facts actually found by the district court. In this part of its analysis, the district court drew a distinction between *exhibiting* and *experiencing* pedophilic urges. The court concluded that Wooden had not "*exhibited* any pedophilic urges since 2005," J.A. 659 (emphasis added), but it did not conclude that Wooden last *experienced* pedophilic urges in 2005. The district court found Wooden's testimony that "he no longer experiences those [urges]" to be credible, *id.*, but the court made no specific finding about *when* Wooden stopped experiencing pedophilic urges. Accordingly, the evidence from the 2011 proceedings is not inconsistent with the district court's findings in these proceedings. Even if Wooden was *experiencing* urges in 2011, there is no evidence that he was outwardly *exhibiting* those urges at that time. Likewise, a conclusion that Wooden was experiencing pedophilic urges in 2011 is not inconsistent with the district court's determination that Wooden was no longer experiencing urges at the time of the hearing in 2016.

Moreover, while the government argues that the district court should not have accepted Wooden's testimony about whether he had pedophilic urges, it points to no contrary evidence that the court *should* have accepted. The government nonetheless suggests that the absence of evidence of pedophilic urges does not mean that Wooden is not currently experiencing those urges, given that Wooden "showed no evidence of pedophilia while in custody between 1984 and 2001, but clearly experienced such urges when he went back to the community." Brief of Appellant at 17-18.

To accept the government's argument would effectively mean that an offender diagnosed with pedophilic disorder could never be released, as the government could

28

always prove future impulse-control problems by pointing to past failures to exercise control. The structure of the Act, which requires discharge if the inmate is no longer sexually dangerous, clearly shows that Congress believed that sexually dangerous predators could change and grow out of the sexually-dangerous classification. The government's argument forecloses that possibility, and we therefore reject it. *Cf. United States v. Antone*, 742 F.3d 151, 169 (4th Cir. 2014) (criticizing district court's acceptance of expert opinion that "did not allow for a respondent's subsequent growth").

There is no evidence in the record that Wooden ever told anyone at Butner that he was still experiencing pedophilic urges or that he engaged in any conduct at Butner that would suggest he was still experiencing those urges.[7] While Malinek and Ross testified that Wooden still suffered from pedophilic disorder, they offered no testimony about whether Wooden was suffering from pedophilic urges at the time of the hearing. Ross, who had interviewed Wooden in 2015, did not testify that Wooden admitted to experiencing pedophilic urges. She based her continued diagnosis on the fact that she believed Wooden suffered from pedophilic disorder at the commitment hearing and had seen "no evidence which suggests that that has changed in any way or that the IDD would be a better explanation for his sexual offenses." J.A. 411. Malinek likewise provided no

---

[7] While there may be limited opportunities for an inmate to engage in conduct indicative of pedophilic urges, it is not impossible. For example, when Wooden was transferred to Butner in 2005, he sent a Christmas card to the seven-year-old boy at the center of the 2005 laundry-room incident. Even the defense expert advocating against commitment in the 2011 proceedings believed that "[a]ttempting to correspond with children" was an "overt behavior[]" that would be indicative of "ongoing pedophilia." *Wooden I*, 693 F.3d at 455. There is no indication that Wooden has ever again attempted to correspond with children.

testimony that Wooden was currently experiencing urges about children. Nor could he have, given that he has never interviewed Wooden and conducted his evaluation by performing actuarial assessments and reviewing documents such as police reports, mental-health treatment records, and prison records, none of which provided any information about whether Wooden was experiencing pedophilic urges at the time of the hearing.

The only actual evidence of whether Wooden was then experiencing intense pedophilic urges is found in Wooden's testimony and that of Drs. Winsmann and Plaud, both of whom had interviewed Wooden multiple times. Wooden denied he was currently experiencing pedophilic urges at the hearing and in his interviews with Winsmann and Plaud. As experts with experience in sexually violent predator commitment proceedings, Winsmann and Plaud would not blindly take Wooden's statements at face value, but would use their training to evaluate the credibility of his statements. *Cf. United States v. Perez*, 752 F.3d 398, 408 (4th Cir. 2014) (explaining that after interviewing Adam Walsh detainee, Dr. Plaud rejected detainee's denial of pedophilic arousal and described detainee as "an untreated pedophile who is actively denying his sexual arousal patterns" (internal quotation marks omitted)). They nevertheless found his denials to be credible, and they testified that they knew of no evidence showing that Wooden was currently experiencing pedophilic urges.

The government thus asks us to reject as clearly erroneous a factual conclusion that was based on a credibility finding about the only affirmative evidence directed to that issue. The district court, as fact-finder, could have rejected Wooden's claim that he was

30

no longer experiencing pedophilic urges if the court had reason to doubt it. *See Anderson*, 470 U.S. at 575 ("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). The court instead specifically found Wooden's denial of current pedophilic urges to be credible, and the government has pointed to nothing that would permit us to reject that conclusion.

F.

Under clear-error review, our task is to determine whether "the district court's account of the evidence is plausible in light of the record viewed in its entirety." *Anderson,* 470 U.S. at 573-74. If it is, "the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 574. For the reasons discussed above, we cannot say that the district court's view of the evidence regarding the IDD diagnosis is implausible. We therefore conclude that the district court did not err in finding that Wooden suffers from IDD, not pedophilic disorder.

III.

As previously noted, the district court, after rejecting the pedophilic-disorder diagnosis, considered whether IDD qualified as a "serious mental illness, abnormality, or disorder" under the Adam Walsh Act, 18 U.S.C. § 4247(a)(6), or whether Wooden suffered from any other qualifying condition. *See* J.A. 660-62. The district court answered those questions in the negative, and the government has not challenged those conclusions on appeal.

31

Under these circumstances, our determination that the district court did not clearly err when finding that Wooden did not suffer from pedophilic disorder is dispositive of this appeal. The Act authorizes the civil commitment of "sexually dangerous" offenders, 18 U.S.C. § 4248(a), which requires, *inter alia*, proof that the offender "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released," *id.* § 4247(a)(6). Commitment is thus proper under the Act only if the offender (1) "suffers from a serious mental illness, abnormality, or disorder," *and* (2) the illness, abnormality, or disorder causes the offender to "have serious difficulty in refraining from sexually violent conduct or child molestation." *Id.*; *see United States v. Caporale*, 701 F.3d 128, 130, 142 (4th Cir. 2012) (finding clear error in district court's conclusion that inmate did not suffer from a qualifying serious mental illness, but nonetheless agreeing with district court that commitment was not authorized because government failed to prove that inmate would have serious difficulty in refraining from sexually violent conduct); *Hall*, 664 F.3d at 467 (finding no clear error in district court's refusal to commit inmate suffering from pedophilia and antisocial personality disorder because government failed to prove that inmate would have serious difficulty refraining from re-offense). Because we find no clear error in the district court's determination that Wooden does not suffer from a serious mental illness within the meaning of the Act, commitment is not authorized, and there is no need for us to consider whether the district court erred in its analysis of the volitional-impairment issue.

In its briefs filed with this court, the government asserts that, at the very least, the district court should have imposed conditions on Wooden's release. We disagree. The Act requires the "immediate[] discharge[]" of detainees who "will not be sexually dangerous to others if released unconditionally," 18 U.S.C. § 4748(e)(1), and authorizes conditional discharges only for detainees who "*will not be sexually dangerous* to others *if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment*," *id.* § 4748(e)(2) (emphasis added). A conditional discharge thus is authorized only for those detainees who *require* medical care or treatment to *keep* them from being sexually dangerous; a detainee who *is not* sexually dangerous must be discharged unconditionally. In this case, the district court concluded that Wooden does not suffer from a serious mental illness, disease, or abnormality, and that Wooden therefore *is not* sexually dangerous. Accordingly, we conclude that the Act does not permit the imposition of conditions on Wooden's release.[8]

IV.

"The question of whether a person is sexually dangerous is by no means an easy one," *Hall*, 664 F.3d at 467 (internal quotation marks omitted), and the potential consequences of an incorrect decision are steep – a loss of liberty if an inmate is wrongly

_____

[8]     18 U.S.C. § 4748(e), which explicitly authorizes conditional discharges, refers to discharge proceedings initiated by prison officials. This action, however, was initiated by Wooden himself, as authorized by 18 U.S.C. § 4247(h). Because § 4247(h) speaks in terms of "discharge" only and makes no mention of a conditional discharge, Wooden contends that a district court lacks authority to impose conditions on the release of a sexually violent predator in cases where the discharge proceeding was initiated by the inmate under § 4247(h). Given our conclusion that § 4248(e) does not permit a conditional discharge in this case, we need not consider this argument.

found to be sexually dangerous or unspeakable harm to a child if an inmate is wrongly released. Under our judicial system, however, it is the district court, not this court, that is charged with sorting out the factual issues and answering the ultimate question. In this case, the district court was presented with two plausible theories of the case, both of which were supported by facially credible expert evidence. Regardless of whether we would have reached the same conclusion had we been the factfinders, the factual findings of the district court "represent a permissible and reasonable interpretation of the evidence presented at the hearing." *Id.* Under these circumstances, we are constrained to affirm the district court's order requiring Wooden's release.

*AFFIRMED*