**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 19-1391

DOROTHY E. SMITH, Individually and as Executrix of the Estate of Julian Jackson Smith,

Plaintiff - Appellant,

v.

SCHLAGE LOCK COMPANY, LLC,

Defendant - Appellee,

and

AMETEK, INC., sued individually and as successor-in-interest to Haveg Industries, Inc.; successor-in-interest to Hercules, Inc.; ASTENJOHNSON, INC., f/k/a The Asten Group; BECHTEL CORPORATION; CATERPILLAR, INC.; CBS CORPORATION, f/k/a Viacom, Inc., sued as successor-by-merger to CBS Corporation f/k/a Westinghouse Electric Corporation and as successor-in-interest to Haveg Industries, Inc.; CHAMPION INTERNATIONAL CORPORATION; CHAMPLAIN CABLE CORPORATION, f/k/a Hercules, Inc., and as successor-in-interest to Haveg Industries, Inc.; COLGATE-PALMOLIVE COMPANY; CUMMINS POWER GENERATION, INC., d/b/a Cummins Onan; FISHER CONTROLS INTERNATIONAL, LLC; FLOWSERVE CORPORATION, f/k/a The Duron Company, Inc., sued as successor-by-merger to Durco International and also sued as successor-in-interest to Anchor Darling Valves f/k/a Darling Manufacturing; FOSTER WHEELER ENERGY CORPORATION; GENERAL ELECTRIC COMPANY; THE GORMAN-RUPP COMPANY; GOULDS PUMPS, INC.; GRINNELL, LLC, d/b/a Grinnell Corp.; HERCULES, INC.; HONEYWELL INTERNATIONAL, INC., f/k/a Allied-Signal, Inc., sued as successor-in-interest to Bendix Corporation; INTERNATIONAL PAPER COMPANY; THE NASH ENGINEERING COMPANY; RILEY POWER, INC., f/k/a Riley Stoker Corporation, f/k/a D.B. Riley, Inc.; SEQUOIA VENTURES, INC., f/k/a Bechtel Corporation; WARREN PUMPS, LLC; WESTERN AUTO SUPPLY, d/b/a Advance Auto Parts; WEYERHAEUSER COMPANY; THE WILLIAM POWELL

COMPANY; SCOTT CO. OF CALIFORNIA; TOMPKINS-BECKWITH, INC.; INTERNATIONAL BUSINESS MACHINES CORPORATION, d/b/a IBM; WEATHERLY, INC., sued as successor-in-interest to D.M. Weatherly; FARMERS CHEMICAL ASSOCIATION, INC.; THE RUST ENGINEERING COMPANY; BRIGGS & STRATTON CORPORATION; TEXTRON, INC., d/b/a Lycoming Engines; DAVIS-STANDARD CORPORATION; ANDRITZ, INC., f/k/a Ahlstrom Machinery, Inc., f/k/a Kamyr, Inc.; DEZURIK, INC., d/b/a Dezurik-Apco Williametter Eagle, Inc.; CERTAINTEED CORPORATION,

Defendants.

―――――――

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:16-cv-00379-LCB-LPA)

―――――――

Submitted:  December 11, 2020                    Decided:  January 27, 2021

―――――――

Before AGEE, WYNN, and QUATTLEBAUM, Circuit Judges.

―――――――

Affirmed by published per curiam opinion.

―――――――

Lisa White Shirley, DEAN OMAR BRANHAM SHIRLEY LLP, Dallas, Texas; Janet Ward Black, WARD BLACK LAW, Greensboro, North Carolina, for Appellant.  Michael W. Drumke, Catherine Basque Weiler, SWANSON, MARTIN & BELL, LLP, Chicago, Illinois, for Appellee.

―――――――

PER CURIAM:

In 2016, Julian Jackson Smith was diagnosed with mesothelioma, a form of cancer usually caused by asbestos exposure. He died from the illness the following year.

Before his death, Mr. Smith and his wife, Dorothy Smith, brought this action alleging that Schlage Lock Co. and dozens of other defendants may have exposed Mr. Smith to asbestos at some point in the past. Relevant to this appeal, the Smiths sued Schlage Lock on the theory that Mr. Smith inhaled asbestos fibers while working as a pipefitter during the construction of a Schlage Lock plant in Rocky Mount, North Carolina in 1972.

The district court granted summary judgment to Schlage Lock. We affirm.

## I.

Mesothelioma is an aggressive, painful form of cancer that is usually untreatable. The Smiths' expert, Dr. Edwin Holstein, explained that mesothelioma in the United States is almost always caused by the patient's cumulative exposure to asbestos, though the latency period is lengthy—thirty to forty years, on average. According to Dr. Holstein, "there is no known level of asbestos exposure above ambient air levels which has not been shown to contribute to the development of mesothelioma in a sufficiently large exposed population." J.A. 1077.[1] In other words, virtually any asbestos exposure above ambient air levels can contribute to mesothelioma years down the road.[2] These factors make it difficult

---

[1] Citations to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.
[2] To the extent Dr. Holstein's opinion is debated in the scientific community, we do not take a position on that dispute. Nevertheless, because this aspect of Dr. Holstein's opinion does not affect our holding here, we assume its veracity for the sole purpose of resolving this appeal.

to determine the precise source or sources of the patient's cancer-causing asbestos exposure.

Mr. Smith testified to having been exposed or likely exposed to asbestos multiple times over the course of his varied career, including experiencing exposure to insulation that was "more than likely asbestos" during a construction job in 1952; cutting asbestos siding while building an automotive service station in 1957; and cutting asbestos blocks to make a gasket during the construction of an Allied Chemical plant in the late 1960s or early 1970s. J.A. 133; *see* J.A. 160–61, 163, 245, 247–50.

One of Mr. Smith's jobs during this period was a six-to-nine-month stint assisting with the construction of the Schlage Lock plant in Rocky Mount. He worked as a pipefitter, installing steam and cooling-water lines under the direction of Embree Reed, Inc., the plumbing subcontractor who performed the pipe work at the site. Mr. Smith testified that every day during several months of that job, insulators cut and applied insulation to the lines, which created dust that he inhaled. However, he did not know whether that insulation contained asbestos.[3]

After Mr. Smith received his mesothelioma diagnosis in February 2016, the Smiths brought claims under eight causes of action against numerous defendants in federal district court.[4] The defendants included the alleged manufacturers of asbestos-containing products

---

[3] If the insulation did contain asbestos, then according to Dr. Holstein's report, Mr. Smith was at risk of "bystander" exposure to the asbestos as a pipefitter at the Schlage Lock plant. J.A. 1086–87.

[4] The allegations in the operative complaint are as follows: (I) negligence in designing, manufacturing, and selling asbestos-containing products; (II) inadequate

4

as well as the alleged owners of the premises on which Mr. Smith claimed to have been exposed to asbestos. At issue in this appeal is only one claim against one defendant: The Smiths' premises-liability claim against Schlage Lock arising from Mr. Smith's alleged exposure to asbestos while working at the Rocky Mount facility in the early 1970s.[5]

The district court granted summary judgment to Schlage Lock on two independent bases. *Smith v. 3M Co.*, No. 1:16CV379, 2019 WL 1116718, at *4–5 (M.D.N.C. Mar. 11, 2019). First, the court concluded that there was no evidence in the record to support a finding that Mr. Smith was exposed to asbestos during his work at the Schlage Lock plant. *Id.* Second, the court found that the record did not support a conclusion "that Schlage [Lock] exercised control over the jobsite or the work conducted by Mr. Smith during the facility's construction." *Id.* at *5. Mrs. Smith timely appealed both conclusions.

## II.

We review the district court's grant of summary judgment de novo, "drawing all reasonable inferences in favor of the non-moving party." *Emmons v. City of Chesapeake*, 982 F.3d 245, 250 (4th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

product design or formulation; (III) breach of the implied warranty of merchantability; (IV) negligence, negligent retention, and negligent supervision related to the use of asbestos in construction or building maintenance; (V) gross negligence and willful, wanton, and reckless conduct in using, selling, or manufacturing asbestos-containing products; (VI) false representation regarding the dangers of asbestos exposure; (VII) failure to warn of the dangers of asbestos exposure; and (VIII) premises liability.

[5] The district court granted summary judgment to Schlage Lock on all eight claims. *Smith v. 3M Co.*, No. 1:16CV379, 2019 WL 1116718, at *1 (M.D.N.C. Mar. 11, 2019). Mrs. Smith has clarified that she "did not assert, or at least did not maintain, any other claims against Schlage [Lock] other than premises liability." Reply Br. at 3. Accordingly, only Count VIII is relevant to this appeal.

248–50 (1986)). "Summary judgment is appropriate where there is no dispute of material fact and judgment is proper as a matter of law." *Id.*

Of course, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 659 (4th Cir. 2020) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)). And the moving party need not necessarily "produce evidence showing the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.*; *see also Cray Commc'ns, Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 393 (4th Cir. 1994) ("[U]nder *Celotex*, the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." (internal quotation marks omitted)).

"Because this case invokes our diversity jurisdiction, we apply controlling state law on settled issues and predict how the state's highest court would rule on unsettled issues." *Young v. Equinor USA Onshore Props., Inc.*, 982 F.3d 201, 206 (4th Cir. 2020). If the state's highest court "has spoken neither directly nor indirectly on the particular issue before us," decisions from the state's intermediate appellate courts "constitute the next best indicia of what state law is, although such decisions may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." *McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 964 (4th Cir. 2020) (internal

quotation marks omitted) (quoting *Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002)).

III.

The district court granted summary judgment for Schlage Lock first and foremost based on the lack of evidence that Mr. Smith was exposed to asbestos at the Schlage Lock site which later caused his mesothelioma. We agree.

North Carolina has not articulated a clear framework for analyzing asbestos premises liability claims. But it appears undisputed that, in order to establish causation, North Carolina law requires actual exposure to asbestos. *See Wilder v. Amatex Corp.*, 336 S.E.2d 66, 68 (N.C. 1985) ("We agree . . . that at trial plaintiff's evidence must demonstrate that he was actually exposed to the alleged offending products."); *see also Jones v. Owens-Corning Fiberglas Corp. & Amchem Prods., Inc.*, 69 F.3d 712, 716 (4th Cir. 1995) (finding that under North Carolina law, a "plaintiff in a personal injury asbestos case must prove more than a casual or minimum contact with the product containing asbestos" (internal quotation marks omitted)); *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162–63 (4th Cir. 1986) ("To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked."); *Whitehead v. Air & Liquid Sys. Corp.*, No. 1:18CV91, 2020 WL 2523169, at *2 (M.D.N.C. May 18, 2020) ("To prevail in an asbestos-related product-liability action under North Carolina law, a plaintiff must establish that he was actually exposed to the alleged offending products." (footnote omitted) (internal quotation marks omitted)); *Gore*

7

*v. Air & Liquid Sys. Corp.*, No. 5:16-CV-716-BR, 2018 WL 4558182, at *3 (E.D.N.C. Sept. 21, 2018) ("In North Carolina, a plaintiff in a personal injury asbestos case[ ] must prove more than a casual or minimum contact with the product containing asbestos . . . . Instead, the plaintiff must present evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." (internal quotation marks omitted)); *Agner v. Daniel Int'l Corp.*, No. CIV 3:98CV220, 2007 WL 57769, at *4 (W.D.N.C. Jan. 5, 2007) ("[I]n any asbestos case, a plaintiff must (1) identify an asbestos-containing product for which a defendant is responsible, (2) prove that he has suffered damages, and (3) prove that defendant's asbestos-containing product was a substantial factor in causing his damages." (internal quotation marks omitted)). Bearing this exposure requirement in mind, we turn to the evidence here.

When Schlage Lock moved for summary judgment, it first pointed to Mrs. Smith's lack of evidence regarding exposure, including Mr. Smith's admission he had no knowledge that asbestos was even used at the plant. That alone could be enough to "discharge[]" Schlage Lock's burden as the moving party. *Celotex*, 477 U.S. at 325.

But Schlage Lock did more than merely point to Mrs. Smith's lack of evidence—it also put forth its own evidence showing there was no asbestos at the plant. Ms. Gladys Thomas, Schlage Lock's corporate representative, testified she spent "somewhere between 175 and 200 total hours" reaching out to former employees as well as searching for and reviewing documents relating to the plant, including those related to asbestos, industrial hygiene, construction, building specification, and contracts. J.A. 663.

8

As part of her search, Ms. Thomas contacted an employee at the plant to inquire whether he knew of the existence of additional records about the plant. The employee could not find any records for the plant, but said "that there wasn't any asbestos in the building." J.A. 673. Unable to find documentary proof of that, Ms. Thomas searched through the North Carolina Department of Environmental Control for asbestos survey records. Ms. Thomas also looked for any general records for the plant on file with the State of North Carolina but found none, including no records of asbestos abatement. She also provided testimony that the plant

> was built in 1972 as part of another project where another facility was built in 1976. So we have a '72 and [a] '76. Both plant layouts, structure, design, were similar. One was in North Carolina, and one was in Colorado.
>     We believed the buildings were spec'd to be asbestos free on purpose. There is documentation for the Colorado site. There is an asbestos survey. We don't have asbestos in any of the insulation . . . at that facility. . . . [F]or whatever reason, the documents for North Carolina are not available.

J.A. 681.

Lastly, Schlage Lock provided an asbestos sampling summary that indicated two samples of insulation from the plant tested negative for asbestos. Ms. Thomas testified the insulation samples were taken from areas near original piping, and the pipes showed no signs of alterations since 1972. This meant that she "ha[d] no reason to believe that" the tested insulation was not original. J.A. 817.

In sum, Schlage Lock not only pointed to Mrs. Smith's lack of evidence of causation, but also put forth affirmative evidence that there had never been asbestos at the plant.

9

Mrs. Smith, in response, cited two pieces of evidence in an effort to create a genuine issue of material fact on causation. First, Mrs. Smith pointed to "Mr. Smith's testimony that he was constantly present when insulators cut and installed pipe insulation on steam and water lines throughout the building, . . . and . . . that he inhaled the dust created by such work." J.A. 1287–88 (internal quotation marks omitted). Second, she referred to the report of her expert, Dr. Holstein, that stated:

> In most of the[] locations [where Mr. Smith worked as a pipefitter], insulators were followed closely by the pipefitters, insulating the pipes that had just been installed by the pipefitters. In addition, the pipefitters were often engaged in running pipes either to or from major pieces of equipment such as boilers, evaporators and turbines. Mr. Smith was frequently exposed to asbestos from the work of insulators on these large pieces of equipment as he carried out his work on the incoming and outgoing pipes. *The insulation materials from at least 1968 to 1972 on new construction would have been asbestos-containing, including both chrysotile and amosite asbestos.* In many locations, asbestos-containing insulation products would have continued being used until old inventory was consumed.

J.A. 1056 (emphasis added).

But even viewing this evidence in the light most favorable to Mrs. Smith, as we must, it does not create a genuine issue of material fact as to whether Mr. Smith was exposed to asbestos at the plant. First, while Mr. Smith stated he believed he may have been exposed, he nevertheless conceded he had no idea if the insulation used at Schlage Lock contained asbestos. Certainly, Mr. Smith's belief without more is insufficient. *E.g.*, *Arbogast v. A.W. Chesterton Co.*, 197 F. Supp. 3d 807, 813 (D. Md. 2016) ("[B]are beliefs that [the plaintiff] personally was exposed to asbestos . . . . [, even alongside evidence] [t]hat *some* . . . products *may* have had asbestos in them[,] simply is not enough evidence to create a genuine dispute of material fact . . . .").

That leaves only the expert report to create a genuine dispute. Dr. Holstein's report is filled with red flags, first among them, his qualifications. Dr. Holstein described himself as a medical doctor specializing in asbestos-related diseases. Nevertheless, he provided expert opinion testimony on mid-twentieth-century plant construction and material science, asserting that "the insulation materials from at least 1968 to 1972 on new construction would have been asbestos-containing." J.A. 1056.

Excepting that red flag, he failed to cite any facts or data related to the specific plant in question in the formulation of his opinion, apart from the year it was built. Nowhere does Dr. Holstein indicate he examined the corporate records of Schlage Lock or the plant itself. He cannot have considered the deposition testimony of Ms. Thomas or the report related to the samples of insulation, as both postdated his report. In fact, Dr. Holstein was not provided with, and therefore did not consider, Mr. Smith's medical records. Instead, Dr. Holstein's report states only that he considered Mr. Smith's deposition testimony and the Smiths' litigation statements and documents. In spite of these limitations, Dr. Holstein concluded that in his opinion, "Mr. Smith's cumulative exposures to asbestos while working on the premises of Schlage Lock constituted a substantial factor in the causation of his malignant mesothelioma." J.A. 1057–58.

Experts cannot base their opinions on speculation. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Yet, that appears to be exactly what Dr. Holstein did. He offered an opinion based on general information about the use of asbestos in construction in the late 1960s and early 1970s without considering any facts pertaining to Mr. Smith or the plant at issue. That alone would be questionable. But here, the information

11

from Schlage Lock all suggested asbestos was not used in the construction of the plant and had not been added since. Dr. Holstein's failure even to consider the actual evidence in the case is textbook speculation. So, the district court properly disregarded it. *Woolard v. Carrier Corp.*, No. 1:18CV410, 2020 WL 2572278, at \*3–4 (M.D.N.C. May 21, 2020) (finding evidence that plaintiff believed he was exposed to asbestos through the defendant's products along with expert testimony that had plaintiff been exposed, such exposure would have increased his risk of mesothelioma, was insufficient to give rise to dispute of material fact as to causation); *see also Dash v. Mayweather*, 731 F.3d 303, 324 (4th Cir. 2013) (finding expert report could not "create a genuine issue of material fact through mere speculation or the building of one inference upon another" (quoting *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997))).

Because Mrs. Smith failed to create a genuine dispute of material fact that Mr. Smith was actually exposed to asbestos at the Schlage Lock plant, the district court properly granted summary judgment to Schlage Lock.

IV.

We further agree with the district court that, even if Mr. Smith had been exposed to asbestos at the Schlage Lock site, Schlage Lock cannot be held liable for any related injuries because the exposure arose incident to his work for an independent contractor.

Under North Carolina law, landowners owe a duty of reasonable care to all lawful visitors. *Nelson v. Freeland*, 507 S.E.2d 882, 892 (N.C. 1998). Landowners' duty of care extends to lawfully present independent contractors and their employees. *McCorkle v. N. Point Chrysler Jeep, Inc.*, 703 S.E.2d 750, 752 (N.C. Ct. App. 2010). Here, there is no

12

dispute that Schlage Lock owned the land in question or that Mr. Smith was lawfully present on the land.

Nevertheless, "control is a prerequisite of liability." *Wilkerson v. Norfolk S. Ry. Co.*, 566 S.E.2d 104, 111 (N.C. Ct. App. 2002) (quoting *Mack v. Marshall Field & Co.*, 12 S.E.2d 235, 237 (N.C. 1940)). "[I]n the absence of control, there is no duty." *Lampkin ex rel. Lampkin v. Hous. Mgmt. Res., Inc.*, 725 S.E.2d 432, 435 (N.C. Ct. App. 2012) (collecting cases). North Carolina case law suggests that "the rebuttable 'presumption [is] that possession'"—and with it, liability—"'is in him who has the true title.'" *Petty v. City of Charlotte*, 355 S.E.2d 210, 213 (N.C. Ct. App. 1987) (alteration in original) (quoting *Memory v. Wells*, 87 S.E.2d 497, 500 (N.C. 1955)). In other words, *Petty* put the burden on the defendant landowner to establish that another entity in fact had "exclusive dominion and control of the defective" aspect of the property. *Id.* (internal quotation marks omitted).

But the "general rules on the tort liability of owners and occupiers of land to invitees . . . do not apply to *the actual work* undertaken by independent contractors and their employees." *Cook v. Morrison*, 413 S.E.2d 922, 926 (N.C. Ct. App. 1992) (emphasis added); *see also McCorkle*, 703 S.E.2d at 753 ("This caveat that liability of owners and occupiers of land does not extend to the actual work undertaken by independent contractors and their employees has been recognized and accepted by numerous other jurisdictions, as well as by scholars."). Generally speaking, "an owner or occupier of land who hires an independent contractor is not required to provide employees of the independent contractor a safe place to work nor is he required to take proper safeguards against *dangers which*

13

*may be incident to the work* undertaken by the independent contractor." *Cook*, 413 S.E.2d at 926 (emphasis added) (citing *Brown v. Texas Co.*, 76 S.E.2d 45, 46–47 (N.C. 1953)).

Mr. Smith testified that Schlage Lock produced locks. The Smiths do not contend, and the record does not suggest, that Schlage Lock had any expertise in building construction. Additionally, "[t]he record shows that in 1972, Mr. Smith was employed by Embree Reed, Inc., a plumbing subcontractor, to perform pipe installation" at Schlage Lock's new Rocky Mount plant. *Smith*, 2019 WL 1116718, at *4. Mr. Smith testified directly to that fact, explaining that Embree Reed paid his wages and told him what to do at the Schlage Lock site. When asked if he ever saw a Schlage Lock employee at the site, Mr. Smith stated only that he "[m]ay have." J.A. 554. And he testified that, as far as he knew, Schlage Lock "just contracted out [the construction] and said [we] want this facility built." *Id.*

At the summary judgment stage, the non-movants—here, the Smiths—are entitled to any *reasonable* inferences that may be drawn in their favor. *Emmons*, 982 F.3d at 250. But here, the only reasonable inference arising from the record is that Schlage Lock did not perform the construction itself, and instead hired contractors to build the plant and simply "hand [Schlage Lock] the keys" of the completed building. J.A. 799. Any notion that Schlage Lock itself built the plant is "[u]nsupported speculation" that cannot defeat summary judgment. *CTB*, 954 F.3d at 659. Accordingly, Schlage Lock satisfied its burden to demonstrate that another entity had control over the relevant portion of the work site by pointing to the undisputed fact that Schlage Lock engaged a contractor, Embree Reed, to complete the pipefitting work.

Moreover, Mr. Smith's injuries are alleged to have arisen incident to that work.[6] As the district court noted, "[a]lthough Mr. Smith did not work directly with insulation, he testified that there were insulators working on the jobsite who installed and cut insulation, within close proximity" and that "the cutting of insulation created dust that he inhaled." *Smith*, 2019 WL 1116718, at *4. Thus, even if Mr. Smith's injuries were caused by inhaling asbestos fibers at the Rocky Mount site, those injuries arose incident to his employment by Embree Reed, and Schlage Lock cannot be held liable for them. *See Cook*, 413 S.E.2d at 926.

To be sure, there are two exceptions to North Carolina's independent-contractor rule. First, the person or entity who employs an independent contractor—here, the landowner, Schlage Lock—may be held liable for the independent contractor's negligence if "the employer retains the right to control the manner in which the contractor performs his work." *Woodson v. Rowland*, 407 S.E.2d 222, 234 (N.C. 1991); *see Denny v. City of Burlington*, 70 S.E. 1085, 1087 (N.C. 1911) (noting that the employer of the contractor can be held liable if he or she "retain[s] the right to direct and control the time and manner of executing the work or . . . interfer[es] with the contractor and assum[es] control of the work, or of some part of it" (quoting 1 John D. Lawson, *Rights, Remedies, and Practice* § 299 (1889))); *see also Commee v. Nucor Corp.*, 173 F. App'x 209, 212 (4th Cir. 2006) (per curiam) (collecting cases). Second, an employer necessarily retains control when it hires an independent contractor "to perform an inherently dangerous activity" because, in such

_____

[6] The Smiths allege as much in their complaint.

15

a case, the employer cannot delegate away "the duty to provide for the safety of others."[7]

*Woodson*, 407 S.E.2d at 235; *see also Denny*, 70 S.E. at 1087.

Mrs. Smith has not contended that Mr. Smith was engaged in anything other than "ordinary building construction work," which is not inherently dangerous under North Carolina law.[8] *Copeland v. Amward Homes of N.C., Inc.*, 837 S.E.2d 903, 906 (N.C. Ct. App.) (citing *Vogh v. F. C. Geer Co.*, 88 S.E. 874, 876 (N.C. 1916)), *review allowed by* 851 S.E.2d 360 (N.C.), *and review allowed by* No. 56PA20, 2020 WL 7482966, at *1 (N.C. Dec. 15, 2020); *see also Smith*, 2019 WL 1116718, at *3 n.5 (collecting cases). Thus, she can avoid summary judgment only by pointing to facts showing that there is a genuine

---

[7] The Court of Appeals of North Carolina has pointed out that, "[a]lthough the 'inherently dangerous' analysis may apply to premises liability," the case giving rise to that exception was "a case dealing with master-servant liability . . . , and not with premises liability." *McCorkle*, 703 S.E.2d at 753 n.3 (citing *Brown*, 76 S.E.2d at 46–47). However, this Court has previously applied the exception in the context of premises liability. *See Commee*, 173 F. App'x at 211 ("This general rule applies with equal force regardless of whether we treat [the defendant] as a landowner or a general contractor."). For purposes of this analysis, we assume that the exception can apply in a premises-liability action.

[8] It appears that the involvement of asbestos-containing materials can render construction work inherently dangerous under North Carolina law, though this is a fact-specific inquiry. *See Wagers v. SGL Carbon, LLC*, No. CIV.A. 2:10-02916, 2011 WL 1337154, at *6 (E.D. Pa. Apr. 6, 2011) (noting that "[n]o North Carolina court has determined whether the use of asbestos-containing materials qualifies [as an] inherently dangerous activity as a matter of law," and citing *Schenk v. HNA Holdings, Inc.*, 613 S.E.2d 503, 507 (N.C. Ct. App. 2005), in which the issue was submitted to the jury as a question of fact). But Mrs. Smith makes no argument on appeal that the work implicated here was inherently dangerous, so we do not consider the question further. *See Suarez-Valenzuela v. Holder*, 714 F.3d 241, 248 (4th Cir. 2013) (noting that an appellant's failure to raise an issue in its opening brief with supporting citations "triggers abandonment of that claim on appeal" (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999)) (citing Fed. R. App. P. 28(a))); *cf. Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) ("The responsibility to comb through the record in search of facts relevant to summary judgment falls on the parties—not the court.").

dispute as to whether Schlage Lock otherwise maintained "the right to direct and control the time and manner of executing the work" it hired Embree Reed (and through it, Mr. Smith) to perform. *Denny*, 70 S.E. at 1087. This she cannot do.

As the district court noted, the only evidence in the record regarding Schlage Lock's control over the work site suggested that Schlage Lock had relinquished control to its contractors. *Smith*, 2019 WL 1116718, at \*5. Mr. Smith testified that Embree Reed was his employer, paid his wages, and told him what to do, whereas Schlage Lock did not tell him what to do. *Id.* He also testified that he "[m]ay have" seen a Schlage Lock employee, but never spoke to one. *Id.* There are no facts from which we may draw a reasonable inference that Schlage Lock retained control over the plumbing work that Embree Reed had contracted to perform.

Both this Court and North Carolina courts have declined to find control even where much more compelling evidence of potential forms of control was available. *See, e.g.*, *Commee*, 173 F. App'x at 213 (declining to find control where the defendant "maintained a supervisory presence on the site and retained the right to inspect [the contractor]'s work, materials, and equipment" and "retained oversight over safety measures"); *Denny*, 70 S.E. at 1087 (declining to find control where the defendant's engineer "was present now and then when the work was going on" and "made a suggestion . . . as to how some of it should be done"); *cf. Hooper v. Pizzagalli Constr. Co.*, 436 S.E.2d 145, 149 (N.C. Ct. App. 1993) ("The record indicates that [the general contractor] had a general supervisory role, but did not interfere with [the subcontractor]'s work or any part of its work so as to retain control and thereby make itself liable.").

17

Mrs. Smith argues that summary judgment is inappropriate because Schlage Lock has failed to produce a contract showing that it relinquished control of the premises. We disagree. As noted, there is no dispute that Embree Reed was an independent contractor and that it, not Schlage Lock, was the entity in charge of the plumbing work. And while a contract can provide helpful evidence regarding the question of whether the landowner retained control over the contractor's work, *see, e.g.*, *McCorkle*, 703 S.E.2d at 754, North Carolina courts do not always review the contract between the entities in analyzing this question. Rather, they look to factors like whether the entity that employed the contractor had personnel at the site and what role such personnel played. *E.g.*, *Denny*, 70 S.E. at 1086–87 (declining to "set out" the terms of the written contract in its opinion "as [the court] deem[ed] it unnecessary to do so," and instead analyzing the question of control through the lens of "the evidence in th[e] case"—namely, witness testimony regarding the presence of the landowner's employee at the site); *cf. McCorkle*, 703 S.E.2d at 754 (relying on similar evidence in addition to analyzing the contract).

We conclude that the independent-contractor exception to landowner liability applies here. The facts viewed in the light most favorable to the Smiths show that Mr. Smith was employed by an independent contractor and, incident to that work, breathed in dust alleged to contain asbestos. And there is no evidence that Schlage Lock directed the work of that or any other independent contractor on the site. Therefore, the district court properly granted summary judgment to Schlage Lock.

## V.

It appears that Mr. Smith was exposed to asbestos multiple times, and that exposure almost certainly caused the terrible disease that led to his death. But we must agree with the district court that Schlage Lock is not a proper defendant for pursuing damages related to that harm. The Smiths failed to produce evidence that Mr. Smith was exposed to asbestos at the Schlage Lock construction site. And even if he was, under North Carolina law, Schlage Lock cannot be held liable for harms arising from such exposure, as it was incident to his work for an independent contractor. Accordingly, we affirm the district court's grant of summary judgment to Schlage Lock.

*AFFIRMED*