**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 19-7692

UNITED STATES OF AMERICA,

    Petitioner - Appellee,

  v.

KEVIN MICHAEL SHEA,

    Respondent - Appellant.

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Louise W. Flanagan, District Judge.  (5:14-hc-02184-FL)

Argued:  December 11, 2020          Decided:  March 2, 2021

Before NIEMEYER, KEENAN, and WYNN, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Keenan and Judge Wynn joined.

**ARGUED:**  Jaclyn Lee Tarlton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Genna Danelle Petre, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  G. Alan DuBois, Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Raleigh, North Carolina, for Appellant.  Robert J. Higdon, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

NIEMEYER, Circuit Judge:

We decide here whether Kevin Shea — who was civilly committed in 2015 to the custody of the Attorney General under the Adam Walsh Child Protection and Safety Act of 2006 as a sexually dangerous person — was properly released under government-proposed conditions that prescribe a "regimen of medical, psychiatric, or psychological care or treatment," 18 U.S.C. § 4248(e)(2), or should have been released without such conditions, as Shea maintains. Neither party contends that Shea should not have been released at all.

The district court ordered that Shea be discharged from civil commitment, but it did so subject to the government-proposed conditions, which provide Shea with a prescribed regimen of care and treatment. It found that Shea still suffered from a serious mental illness or mental disorder and that he would have difficulty in refraining from sexual misconduct if he were released without conditions. In reaching that conclusion, the court relied on Shea's extensive history of sexual misconduct and the testimony of the government's expert witnesses.

Because we conclude (1) that the district court did not clearly err in finding that Shea would be sexually dangerous to others without the conditions and (2) that it did not procedurally err in imposing the conditions — as Shea now contends for the first time on appeal — we affirm.

# I

Kevin Shea has an extensive criminal history of sexual misconduct that reaches back to 1978, and he continued to offend almost continuously up until his conviction for child-pornography offenses in 2000, for which he was sentenced to 150 months' imprisonment. But most of his life of sexual misconduct involved hands-on contact with children, concededly numbering over 100, and a number of those he molested. And during this 40-plus-years history, Shea never lived in the community for any significant period of time without reoffending.

In July 2011, while Shea was still in federal custody serving the sentence for his 2000 child-pornography conviction, the government filed with the clerk of the district court a certificate under the Adam Walsh Act asserting that Shea was a sexually dangerous person and seeking to civilly commit him to the custody of the Attorney General upon completion of his prison term. Following a hearing, the district court concluded that the government had failed to establish the requirements for such commitment, and Shea finished his prison term in due course in 2012. Thereafter, Shea began a five-year period of supervised release. About a year after his release from prison, however, Shea was found to have violated the terms of supervised release because he picked up a 16-year old boy and allegedly solicited him for sex. The court revoked Shea's supervised release and sentenced him to 27 months' imprisonment followed by 33 months' supervised release.

While Shea was still in prison serving the 27-month sentence, the government again filed a certificate with the clerk to civilly commit him as a sexually dangerous person. This time, Shea consented to commitment because he wanted to get better. Accordingly, by a

consent order dated March 30, 2015, the district court committed him to the custody of the Attorney General, who sent him to FCI Butner, a federal prison and treatment facility in North Carolina. While at Butner, Shea entered into the Commitment and Treatment Program, which consists of four phases running from orientation to eventual community-reintegration preparation and planning. Shea took his treatment seriously and was promoted to the fourth and final phase of the program in December 2018.

On February 1, 2019, Shea, then 64 years old, filed a motion pursuant to 18 U.S.C. § 4247(h), seeking his discharge from custody on the ground that, based on the reports of two experts, he no longer met the criteria for civil commitment. After the district court ordered a hearing, the government filed a certificate of the Warden of Butner pursuant to § 4248(e), stating that "Mr. Shea's condition is now such that 'he will not be sexually dangerous to others *if released under a prescribed regimen* of medical, psychiatric, or psychological care or treatment.'" (Quoting 18 U.S.C. § 4248(e)(2) (emphasis added)). In that filing, the Warden certified that the prescribed regimen proposed to be imposed as 38 conditions of release was "appropriate." She requested that Shea be released under those conditions. The regimen was "designed by Mr. Shea's treatment team as well as the United States Probation Office." It would require Shea, among other things, to participate in group and individual treatment for sex offenders, to consent to GPS monitoring for a year, to keep a driving log, and to submit detailed financial records to his probation officer on a monthly basis. It would also prohibit Shea from, among other things, having direct contact with minors, owning a firearm, drinking alcohol, and operating any device with internet access unless approved by his probation officer.

4

At the hearing, which took place on September 13, 2019, Shea did not challenge the substance of the Warden's prescribed regimen, and the parties and the court did not address the regimen's substance; they focused only on whether Shea should be released with the government's proposed conditions *or with no conditions at all*. Indeed, in the proposed findings of fact that Shea submitted to the court, Shea stated that if his release were ordered to be with conditions, the conditions should be those proposed by the government.

Shea testified at the hearing to his experience in treatment, explaining that his treatment had forced him to confront the pain he had caused his victims and had taught him various coping mechanisms for controlling his urges. Indeed, Shea testified that his time in treatment had taught him that he needed to overhaul his entire life — "It's things like relationships, health and wellbeing, career and employment, learning and personal growth, citizenship and community, spiritually, recreation and leisure; all things that are pieces of people's lives . . . need to be pieces of my life." Shea acknowledged at the hearing that he had prepared a "Good Life Plan" dated June 3, 2019, some three months before the hearing, and stated that it was "true." In the Plan he stated, "I am sexually attracted to the youth and risk-taking of teenage boys and young male adults" and that he needed to avoid, after his release, unsupervised contact with "minor boys." But at the hearing Shea revised that statement in his Plan, testifying that he remained sexually attracted to "young adult males," not "teenage boys." Shea also acknowledged that he had had a few minor infractions for violating rules while in custody, but he stated that he always learned from his mistakes. As to the substance of the regimen contained in the government's proposed conditions, Shea

testified that he largely agreed with them and planned to live by them even if they were not required by the court.

Shea also presented the testimony of two experts, Dr. Hy Malinek and Dr. Joseph Plaud, to support his release without conditions. Dr. Malinek testified that while Shea previously had met the definition of pedophilic disorder, he was no longer sexually dangerous because he did not presently have a serious "mental disorder that would predispose him to commit sexual acts." He explained that while pedophilic disorder is a lifelong and chronic condition, the "strength of sexual urges changes." Dr. Plaud similarly testified that Shea did not at that time suffer from a serious mental impairment and that, "with or without conditions," he would not have serious difficulty refraining from reoffense.

The government also presented two experts, Dr. Trisha Smithson, a psychologist and treatment provider for Shea while at Butner, and Dr. Rebecca Barnette, a forensic psychologist at Butner who evaluated Shea on an annual basis. Dr. Smithson described Shea's treatment plan, goals, and need for continued treatment, explaining that one purpose of the conditions was to provide Shea with a "structured environment" so that he does not "get off track" once released. Similarly, Dr. Barnette testified that Shea needed a "structured" environment to avoid relapse when released into the community. She also reaffirmed her diagnoses of Shea that he continued to suffer from pedophilic disorder and "other specified paraphilic disorder." She concluded with her opinion that "at this time" Shea would not be "appropriate for unconditional release" but that he would be

6

"appropriate for conditional release with the conditions that have been presented to the Court in this case."

The district court found that Shea still suffers from a serious mental illness or mental disorder and would remain a sexually dangerous person within the meaning of the Adam Walsh Act if released without conditions and, therefore, that he could be released only with conditions, as stated in the opinions of the government's experts. The court explained that it "found the testimony of the [government's] medical professionals very compelling." While the court "commend[ed]" Shea for the work he had done at Butner, it noted that Shea did not "have a good track record in the community" and has a history, even at Butner, of "pushing boundaries." It therefore found the proposed conditions of release to be "appropriate," although not necessarily permanent. The court stated that it would "welcome receiving a request down the road to make [Shea's discharge] unconditional."

After the court announced this decision, Shea suggested to the court that an additional condition be added that would prohibit him from possessing *any* kind of pornography, not just child pornography. The court said that the suggestion was a "very good idea" and added that condition.

The court formally entered its order on September 13, 2019, and Shea has now appealed it, arguing that the court should not have included conditions and that, in any event, the district court erred procedurally in approving them without explanation.

## II

The Adam Walsh Act authorizes a district court — upon the government's filing of a certificate that a person is sexually dangerous and a hearing conducted by the court — to commit a "sexually dangerous person" to the custody of the Attorney General. 18 U.S.C. § 4248(a), (c), (d). The Act also provides that the committed person must be discharged from custody when the court finds that the person (1) "is no longer sexually dangerous to others" or (2) "will not be sexually dangerous to others if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment" that has been certified by the director of the facility in which the person is committed. *Id*. § 4248(e). After any discharge ordered with conditions imposing a prescribed regimen, the court remains authorized to "modify or eliminate the regimen." *Id*.

The Act defines a "sexually dangerous person" as "a person [1] who has engaged or attempted to engage in sexually violent conduct or child molestation *and* [2] who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5) (emphasis added). And "sexually dangerous to others" is defined to mean that "the person suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id*. § 4247(a)(6). In short, a person is sexually dangerous under the Adam Walsh Act if (1) he "has engaged or attempted to engage in sexually violent conduct or child molestation" and (2) currently "suffers from a serious mental illness, abnormality, or disorder" (3) that would cause him "serious difficulty in refraining from sexually violent conduct or child molestation if released." *Id*. § 4247(a)(5), (6).

8

To commit a person, the government must prove all three elements defining a sexually dangerous person by clear and convincing evidence. 18 U.S.C. § 4248(d). To obtain a discharge, the committed person carries the burden to show by a preponderance of the evidence that he is no longer sexually dangerous. *Id*. § 4248(e); *see also United States v. Wooden*, 217 F. Supp. 3d 843, 850–51 (E.D.N.C. 2016).

At every hearing conducted for civil commitment and discharge under the Adam Walsh Act, the person subject to the hearing must be provided with counsel and must be "afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." 18 U.S.C. § 4247(d).

In this case, Shea was committed by consent to the custody of the Attorney General as a sexually dangerous person following a hearing conducted on March 30, 2015, and discharged subject to a regimen of care and treatment following a hearing conducted on September 13, 2019. In this appeal, he challenges the fact that conditions were imposed, arguing that he is no longer a sexually dangerous person. He also now challenges the procedure that the district court followed in imposing them.

III

The district court's core finding was that Shea would not be sexually dangerous if released under a prescribed regimen of medical, psychiatric, or psychological care or treatment. Stated otherwise, the court found that Shea has a serious mental illness or mental disorder and would have serious difficulty in refraining from engaging in or attempting to

9

engage in sexually dangerous conduct if released without the regimen imposed by the conditions. While the court took into account Shea's history, it based its finding mainly on the expert testimony of Dr. Barnette and Dr. Smithson, which was presented by the government, giving their testimony more weight than the expert testimony of Dr. Plaud and Dr. Malinek, which was presented by Shea.

Shea contends that the district court erred in finding that his discharge should be subject to conditions, claiming that he is "no longer sexually dangerous." He argues that the court's finding "cut[s] against the clear weight of the evidence demonstrating that [he] does not meet the second and third elements of the sexually dangerous classification — he does not presently suffer from a serious mental illness and he would not have serious difficulty refraining from child molestation if released unconditionally." To support that claim he relies mainly on the testimony of Dr. Malinek and Dr. Plaud, but he also points to the facts that at the time of the hearing, he was "sixty-four years old, had not had a hands-on offense in twenty years, and had completed four and a half years of treatment without disciplinary infraction or evidence of sexual preoccupation."

The government contends that "the district court did not clearly err in finding [that Shea] failed to meet his burden [that] he was no longer sexually dangerous such that he could be released without conditions." The government points to Shea's extensive history of sexual abuse and the district court's finding that Dr. Barnette's opinion in particular was "thorough, well-reasoned, and supported by the record" and therefore should be given "greater weight" than the opinions of Dr. Plaud and Dr. Malinek, who testified on Shea's behalf. The government argues that the court's finding was not clearly erroneous because

10

"neither [of Shea's experts] fully considered [his] dynamic risk factors and both ignored [his] considerable struggles with sexual preoccupation and deviant sexual interest. Notably, Dr. Malinek did not even diagnose [Shea] with a pedophilic disorder, despite [Shea's] 100 known victims."

The parties do not dispute Shea's history, including his record while at Butner. Essentially, they engage in a battle of experts, which the district court resolved in the government's favor. Such a dispute raises the question about our standard for reviewing a district court's findings based on its weighing of competing expert opinions, to which we turn first.

## A

Expert opinions are, to be sure, not facts that can be found as true or false. Whether a defendant was driving on the wrong side of the road prior to a crash is a question of historical fact that can be proved one way or another. And it is the role of the district court's factfinding, whether by judge or jury, to find that fact. Because of that role, as well as the district court's advantage in hearing and "weighing" evidence, a court of appeals defers to the district court's factfinding (whether by judge or jury), rejecting such a finding only if the appellate court finds there to be clear error — that is, when the appellate court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (quoting *United States v. Gypsum Co.*, 333 U.S. 364, 395 (1948)). This deference is strong, and a court of appeals is not entitled to second guess the district court "simply because it is convinced that it would have decided

11

the case differently" or "weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985). And when a factual finding is based on witness credibility, the appellate court gives "even greater deference." *Id.* at 573.

But an expert opinion is not fact that can be proved true or false. It is opinion. While we recognize the value of expert opinions in trials to assist factfinding, *see* Fed. R. Evid. 702, the standards applicable to the district court's function in receiving, assessing, and relying on expert opinions are distinct from the standards for finding historical facts.

In considering the admissibility *vel non* of expert testimony, the district court performs a gatekeeping function to determine whether the expert evidence would be relevant and reliable. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (holding that the *Daubert* gatekeeping standard applies not only to "scientific testimony" but also to "all expert testimony"). A court of appeals then reviews the district court's decision to admit or deny expert testimony for abuse of discretion. *See id.* at 152 (citing *General Electric Co. v. Joiner*, 522 U.S. 136, 138–39 (1997)); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practice & Prods. Liab. Litig. (No. II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

Once expert testimony is admitted, the factfinder in the case, whether judge or jury, must determine the weight to give it, and that is again a discretionary decision. In assessing expert opinion, the factfinder cannot conclude that it is true or false. Rather, it must determine the weight to give the opinion by considering whether it is "plausible, coherent, and internally consistent," *United States v. Wooden*, 887 F.3d 591, 603 (4th Cir. 2018), and "not contradicted by extrinsic evidence," *United States v. Caporale*, 701 F.3d 128, 142 (4th

Cir. 2012) (cleaned up). Indeed, in the context of an administrative hearing under the Black Lung Benefits Act, we articulated similar criteria in yet more detail:

> In weighing [expert] opinions, the ALJ is called upon to consider their quality. Thus, the ALJ should consider the qualifications of the experts, the opinions' reasoning, their reliance on objectively determinable symptoms and established science, their detail of analysis, and their freedom from irrelevant distractions and prejudices. In addition, the ALJ should consider whether an opinion was, to any degree, the product of bias in favor of the party retaining the expert and paying the fee.

*Underwood v. Elkay Mining, Inc.*, 105 F.3d 946, 951 (4th Cir. 1997), *superseded on other grounds by regulation, as recognized in Elm Grove Coal Co. v. Director, O.W.C.P.*, 480 F.3d 278, 289–92 (4th Cir. 2007). Because the assessment of the weight to give an expert opinion is a discretionary determination committed to the factfinder, courts of appeals defer to that determination, reviewing only for abuse of discretion.

Once a district court judge or jury makes the determination that one expert's opinion is to be given more weight than another, the judge or jury then finds facts, and those findings are subject to appellate review under the clear error standard, as discussed. *See Wooden*, 887 F.3d at 602, 605–06. But in reviewing under the clear error standard, the appellate court can consider whether the factfinder abused its discretion in favoring one expert opinion over another under the established criteria for evaluating expert opinions. If an appellate court finds such abuse, it can conclude that the ensuing factual finding was clearly erroneous. But courts of appeals "should be especially reluctant to set aside a finding based on a trial court's evaluation of conflicting expert testimony." *United States v. Heyer*, 740 F.3d 284, 292 (4th Cir. 2014) (quoting *Hendricks v. Cent. Rsrv. Life Ins. Co.*,

13

30 F.3d 507, 513 (4th Cir. 1994)); *see also United States v. Francis*, 686 F.3d 265, 273 (4th Cir. 2012).

In *Wooden*, we faced circumstances similar to those presented here that required us to assess whether the district court *clearly erred* in finding, based primarily on the expert testimony of Dr. Frederick Winsmann, that "Wooden no longer qualified as a sexually dangerous person." 887 F.3d at 594; *see also id.* at 596–602. In assessing that finding, we concluded:

> Winsmann's testimony, standing alone, was coherent, plausible, and internally consistent; it is not any less so when it is placed beside [Dr. Hy] Malinek's testimony. Under these circumstances, the district court's decision to accept Winsmann's views over Malinek's contrary views is *not clearly erroneous. See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

*Id.* at 606 (emphasis added).

In short, while the district court (whether by judge or jury) exercises discretion in weighing expert testimony, its findings based on that assessment are reviewed for clear error.

This is the standard we now apply.

B

While Shea agrees that he satisfies the first element defining a "sexually dangerous person," having engaged in child molestation, he argues that he does not satisfy the second and third elements — that he still suffers from a serious mental illness or mental disorder and that he would have "serious difficulty" in refraining from reoffending. Because all

14

three elements must be satisfied, he argues that he no longer qualifies as a sexually dangerous person and should have been released without conditions. In arguing that the second and third elements are not satisfied, he relies on the testimony of the two experts he presented at the hearing, Dr. Malinek and Dr. Plaud, both of whom gave opinions that, *at the time of the hearing*, Shea did not suffer from a serious mental illness or mental disorder. Shea also relies on the historical facts that his last hands-on offense was 20 years earlier and that he has not exhibited any indications in custody "that pedophilic disorder still has grip over" him. In addition, he points to his success in treatment and his rigorous release plan; his advanced age, which has diminished his libido; and the decreased statistical likelihood that he will recidivate.

But the district court found otherwise, giving greater weight to the government's expert testimony than to Shea's. As to whether Shea continues to suffer from a serious mental illness or mental disorder, Dr. Barnette testified that she had diagnosed Shea with pedophilic disorder and other paraphilic disorder when Shea began treatment and that "those are [still] applicable to Mr. Shea." She explained that Shea's history, his behavior when he was last in the community, and Shea's overall "abnormal sexual arousal pattern" supported these diagnoses. Dr. Barnette's testimony also aligned with her 2019 forensic update on Shea — conducted five months before the hearing — which likewise affirmed that these diagnoses "remain appropriate." Moreover, even Dr. Malinek, one of Shea's experts, concluded in his October 2018 expert report that there is "current evidence of a mental disorder or sexual deviation which would predispose Mr. Shea to the commission of criminal sexual acts" — namely, pedophilic disorder. Dr. Malinek's report recognized

15

that "the diagnosis of Pedophilic disorder is considered lifelong and chronic, and the fact that Mr. Shea has not shown evidence of it in custody does not mean that he is not sexually aroused by children."

To be sure, Dr. Malinek later walked back his report's diagnosis of pedophilic disorder, testifying that "the evidence for it was weak" and that he has "change[d] his opinion on that." In a similar vein, Dr. Plaud, Shea's other expert, testified that while Shea historically met the diagnostic criteria for pedophilic disorder, that disorder lacks "grip strength" over Shea such that it is not a *serious* mental illness as required by the Adam Walsh Act.

In finding Dr. Barnette's opinion more compelling, the district court did not abuse its discretion. Dr. Barnette's testimony was "plausible, coherent, and internally consistent," *Wooden*, 887 F.3d at 603, and "not contradicted by extrinsic evidence," *Caporale*, 701 F.3d at 142 (cleaned up). Moreover, Dr. Barnette's diagnosis of pedophilic disorder was also supported by Dr. Malinek's expert report. In these circumstances, we conclude that the district court did not clearly err in finding that Shea continues to suffer from a serious mental illness based on the expert testimony before the court. *See Anderson*, 470 U.S. at 574 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous"); *see also Francis*, 686 F.3d at 273.

As to the third element — whether Shea would have serious difficulty in refraining from sexual misconduct if released unconditionally — the evidence likewise supported the district court's finding. As with the mental-illness element, the question of whether a person's ongoing volitional impairment is sufficiently severe "turns on the significance of

16

the factual information as viewed by the expert psychiatrists and psychologists." *Francis*, 686 F.3d at 275. Here, both of the government's experts testified that the proposed conditions were crucial to helping Shea refrain from reoffense if released. Both Dr. Barnette and Dr. Smithson testified that Shea had a history of "push[ing] the boundaries" and "bend[ing] the rules" while committed. Although the actual instances of such misconduct appeared to have been relatively benign, Dr. Barnette explained that Shea's proclivity for pushing the boundaries is a "long-term vulnerability" because it "can be a really slippery slope." Citing Shea's own testimony, Dr. Barnette explained that "a seemingly unimportant decision can turn into deviance." Dr. Smithson similarly testified that the proposed conditions are aimed at creating a "structured environment," which will help "control [Shea's] impulsive decision making."

Another "dynamic risk factor" identified by the government's experts was Shea's trouble developing genuine adult relationships. As Dr. Smithson explained, this matters because if Shea "continues to have significant difficulty connecting . . . with adults, there is a fear that he would end up" seeking that connection with minors.

Dr. Barnette testified to yet another risk factor — Shea's "sexual arousal pattern to youthful males," considering that he has expressed those interests exclusively "in the community." As Dr. Barnette put it, "the real test for [Shea] is going to be in the community when he has access to victims. That's what has been the problem for him."

When asked specifically if Shea needs conditions on release, Dr. Barnette responded:

17

I absolutely think that Mr. Shea needs conditions. He has struggled in the community. He has never been in the community for a significant period of time without engaging in offending or having difficulties. I think that it's going to be stressful for Mr. Shea to release. And I think that when things get stressful, there's a tendency to revert back to prior coping skills that can be maladapted and cause problems. . . . And I think that having the tools that he has now is one thing, but the supervision will help him to apply those tools. And when he really is faced with those challenges, there will be support for him in place, and there will be just a way to be monitored and kept on the straight and narrow.

Again, the opinions on which the district court relied were plausible, coherent, and internally consistent, and as important, they were not contradicted by extrinsic evidence. Indeed, they better responded to Shea's demonstrated conduct and circumstances than did Shea's experts' opinions. As a consequence, the district court's weighing them favorably over the opinions of Shea's experts did not constitute an abuse of discretion, and the district court's finding based on those opinions is not clearly erroneous.

In sum, we conclude that the district court's finding that Shea would not be a sexually dangerous person as long as he was released under a prescribed regimen was not clearly erroneous.

IV

For the first time on appeal, Shea also contends that the district court erred procedurally in failing to explain "why it imposed" the conditions it did and "how they are part of a prescribed regimen" of care or treatment. He asserts that "the District Court's silence on why it imposed any conditions on [him] . . . deprived this Court of the ability to determine whether the lower court abused its discretion in imposing all of the Government's requested conditions." He argues that the district court should have

18

followed the procedural requirements specified for imposing conditions of supervised release in criminal sentencing. *See* 18 U.S.C. §§ 3553, 3583; *see also United States v. Armel*, 585 F.3d 182, 186 (4th Cir. 2009) (requiring district courts in criminal sentencing to "explain the rationale for the special conditions it imposes" on supervised released).

Shea never argued before to the district court that the conditions — in part or in whole — were not appropriate aspects of a prescribed regimen, and his failure to do so thus denies us the benefit of the district court's response.

More remarkably, during the proceedings before the district court, Shea *actually proposed imposition of the conditions* if the court were to decide that conditions were needed. In his proposed findings of fact submitted to the district court, Shea proposed that the court impose no conditions because he was no longer a sexually dangerous person. In the alternative, however, he proposed that if conditions were to be imposed, the court should "us[e] the proposed conditional release order filed by the government." In addition, at the hearing, Shea testified with respect to the government's proposed conditions that he largely agreed with them and planned to live by them even if they were not imposed by the court. Indeed, he even went so far as to propose an *additional* condition of release, which the court accepted as a good idea.

In short, at the hearing before the district court, Shea never made the substance of the conditions an issue, never objected to them — indeed, affirmatively proposed them if conditions were to be ordered — and suggested that he thought it would be appropriate to abide by them even if conditions were not imposed. Yet, he now argues that the court erred in imposing them without giving an explanation for each condition. If this is not invited

19

error — *i.e.* proposing conditions to the district court that he now challenges on appeal —

*see, e.g.*, *United States v. Jackson*, 124 F.3d 607, 617 (4th Cir. 1997) ("[W]e conclude that any error was invited by Jackson when he knowingly failed to object to the Government's inaccurate portrayal of the stipulation between Jackson and the Government"), it certainly constitutes a waiver, *see United States v. Olano*, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment or abandonment of a known right" (cleaned up)); *cf. United States v. Hale*, 857 F.3d 158, 170 (4th Cir. 2017) (holding that defendant waived objection to the form of a jury instruction where counsel at trial objected to the fact that the instruction was given but explicitly stated "if the court is going to give one, we don't have any problem with the proposed instruction of the court") (emphasis omitted)). Either way, the issue would be unreviewable.

Accordingly, we conclude that Shea's argument that the district court failed to provide an adequate explanation for the conditions is waived.

\* \* \*

The Adam Walsh Act is designed not only to serve the safety interests of the public but also to facilitate the treatment of sexually dangerous persons and thus to provide them a path to good citizenship. This case presents a fine example of where these purposes are being fulfilled. The government and the district court both recognized that Shea had made great strides at Butner, and the district court commended him accordingly. Our opinion today affirming Shea's conditional discharge is in no way intended to undercut that observation or denigrate Shea's progress. To the contrary, we provide judicial encouragement, along with the observation that should Shea continue to demonstrate

20

progress, the Act provides a mechanism for the district court to "modify or eliminate" the conditions that have been imposed. 18 U.S.C. § 4248(e)(2).

The judgment of the district court is

AFFIRMED.